# EXHIBIT E

1  Monica Hartsock, SBN 270114
2  **LAW OFFICE OF MONICA HARTSOCK**
   4562 Hastings Ct.
3  Chino, California 91710
   Telephone: (909) 536-1773
4  Monica@Hartsocklawfirm.com

5  Attorneys for Defendant,
   ALEKSIA LINDSAY (erroneously sued
6  as Aleksia Hepner)

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                     FOR THE COUNTY OF SAN BERNARDINO

10

11 NATIONAL COLLEGIATE STUDENT        Case No. CIVDS1931160
   LOAN TRUST 2007-1, A Delaware
12 Statutory Trust and NATIONAL       Assigned for all purposes to Judge Brian
   COLLEGIATE STUDENT LOAN            McCarville, Dept. S30
13 TRUST 2007-2, A DELAWARE
   STATUTORY TRUST
14                                    **DEFENDANT ALEKSIA LINDSAY fka**
                Plaintiff,            **ALEKSIA HEPNER'S NOTICE OF**
15                                    **MOTION AND MOTION FOR LEAVE TO**
        vs.                           **FILE A CROSS-COMPLAINT;**
16                                    **MEMORANDM IN SUPPORT;**
   ALEKSIA M HEPNER and DOES 1-       **DECLARATION OF MONICA**
17 15, inclusive                      **HARTSOCK; DEFENANT'S PROPOSED**
                                      **CROSS-COMPLAINT**
18              Defendants.
                                      Hearing Date: December 9, 2020
19                                    Hearing Time: 9:00 a.m.
                                      Department No. S30
20
                                      Initial Complaint Filed: October 21, 2019
21                                    Trial Date: None Set

22

23

24

25

26

27

28
                                      1
                  DEFENDANT'S MOTION FOR LEAVE TO FILE A CROSS-COMPLAINT

**PLEASE TAKE NOTICE** that on December 9, 2020, at 9:00 a.m. or as soon thereafter as the matter may be heard, in Department S30 of this Court located at 247 W 3rd St., San Bernardino, CA 92415 Defendant will and hereby does move this Court for an order permitting the filing of a cross-complaint against Plaintiffs and Cross-Defendants. A copy of the proposed cross-complaint is attached hereto as Exhibit A.

This motion is made on the grounds that the proposed cross-complaint arises out of the same transaction or occurrence as does Plaintiffs' complaints and is a related cause of action, as defined in Code of Civil Procedure section 426.50, but was not pleaded earlier as a result of inadvertence by a defendant in pro per. This motion is made on the further grounds that allowing such filing is in the interests of justice and will promote the efficient resolution of all claims between the parties.

The motion will be based upon this notice, the declaration of Monica Hartsock, the attached memorandum of points and authorities, the proposed order, and the papers, records, and file in this action and such oral and documentary evidence as may be presented at the hearing on the motion.

November 10, 2020                    Respectfully submitted,

LAW OFFICE OF MONICA HARTSOCK

_____/s/ Monica Hartsock_

Monica L. Hartsock, Esq.
ATTORNEY FOR DEFENDANT ALEKSIA
LINDSAY (fka ALEKSIA HEPNER)

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

This case involves a debt; defendant Aleksia Lindsay (fka Aleksia Hepner) was the debtor on a student loan and plaintiffs, National Collegiate Student Loan Trust 2007-1 and National Collegiate Student Loan Trust 2007-2 as well as proposed Cross-Defendants are debt collectors and/or the trustee for the Plaintiff Trusts. Plaintiffs allege that defendant owes $94,237.46 plus interest and that defendant breached a contract by failing to pay this debt. Defendant alleges (as set forth more thoroughly in the proposed Cross-Complaint) that (1) Plaintiffs and Cross-Defendants do not have the right to collect any sums from Lindsay and those similarly situated because there is no documentation necessary to prove the Trusts' ownership of the loans, (2) Plaintiffs and Cross-Defendants are aware of their inability to support their claim in lawsuits such as this and (3) with this knowledge, continue to file unsupported debt-collection lawsuits and other unconscionable debt collection practices. Accordingly, Defendant, on behalf of herself and all others similarly situated further claims that the filing of the present case and others like it constates a violation of state and federal law.

Where a defendant's claims for affirmative relief against a plaintiff arise out of the same transaction as forms the basis of the complaint, a defendant must plead those claims in a cross-complaint or risk being forever barred from asserting those claims against plaintiff. (See, Code of Civil Procedure section 426.30.) Here, Plaintiffs' use of this case and the judicial system to sue defendant for debts that it repeatedly fails to show ownership over gives rise to a cross-claim for violation of the California Rosenthal Fair Debt Collections Act, Unfair Competition & Unlawful Business Acts and Practices, The Fair Debt Collection Practices Act, and Declaratory Relief.

Defendant found counsel who substituted in to replace her pro per status shortly before the filing of this motion. Defendant filed this motion as soon as possible after retaining competent counsel and meet and confer attempts to stipulate to the filing of the proposed cross-complaint were extinguished.

1

## II. ARGUMENT

### A. Under California law, this motion should be granted so that all disputes between the parties may be heard in the same lawsuit.

Code of Civil Procedure section 426.50 states:

> A party who fails to plead a cause of action subject to the requirements of this article, whether through oversight, inadvertence, mistake, neglect, or other cause, may apply to the court for leave to amend his pleading, or to file a cross-complaint, to assert such cause at any time during the court of the action. The court, after notice to the adverse party, shall grant, upon such terms as may be just to the parties, leave to amend the pleadings, or to file the cross-complaint, to assert such cause of the party who failed to plead the cause acted in good faith. This subdivision shall be liberally construed to avoid forfeiture of causes of action.

Courts are encouraged to allow the late filing of a cross-complaint even up until the entry of judgment. See, *City of Hanford v. Superior Court (GWF Power Systems, Inc.)(1989) 208 Cal.App.3d 580, 587.* So long as the failure to earlier plead a cross-complaint is in good faith, the compulsory cross-claim must be allowed to be pleaded. See, Code of Civil Procedure section 426.50 and *Silver Organizations Ltd v. Frank* (1990) 217 Cal.App. 3d 94, 99. Where the proposed cross-complaint is compulsory, leave to file must be granted as long as the defendant is acting in good faith. *Id.*.

Even if the Court sees this cross-complaint as permissive rather than compulsory, the liberality standard is applied even to a permissive cross-claim subject to a slightly more rigorous standard:

> Unless it would otherwise interfere with the trial date or otherwise prejudice the action, courts are inclined to grant leave to file any other cross-complaint against the plaintiff. This again reflects the judicial policy of settling all disputes against plaintiff and defendant in the same lawsuit if possible.

*Weil & Brown: Cal. Civ. Proc., Before Trial* (The Rutter Group 2019) at ¶6:564.

Here, whether the cross-complaint is deemed compulsory or permission, defendant should be granted leave to file her cross-complaint as there is no pending trial date, there is no prejudice to the action, and there is no bad faith on the part of Defendant.

2

Moreover, this case was filed by plaintiff in October, 2019, but nothing has been done by plaintiff or defendant. There has been no discovery served by either party and this motion will be heard on the same day as the trial setting conference. Plaintiffs and cross-defendants will have the opportunity to conduct discovery on all of the issues raised in Defendant's cross-complaint and the parties have plenty of time to prepare this case for trial, which is not yet set.

This motion must be granted as the cross-complaint arises out of the same subject matter and involves the same parties and the granting of this motion will not impede the rights of Plaintiffs or cause any trial delays. It is Defendants' right to have all of the claims related to the subject matter of this case, adjudicated at the same time.

**B.    Defendant acted in good faith; any delay in filing the cross-complaint was the result of mistake and inadvertence and exhausting meet and confer efforts.**

Defendant did her best, as a non-lawyer unaware of the applicable law and her rights in filing a form answer. However, it was not until Defendant retained defense counsel, who regularly litigates cases under the fair debt collection statutes that Defendant discovered that she had a claim against Plaintiffs and Cross-Defendants for their actions. Indeed, Defendant's mistaken belief that she did not have her own cross-claim against Plaintiffs was not clarified until Defendant retained counsel in August, 2020. (Hartsock Declaration at ¶2.)

Additionally, Defendant was representing herself in this action as a pro per. Any failure by defendant to learn at an earlier time that she had cross-claims available to her in this case and/or seek counsel was the result of **excusable neglect**.

Defendant did nothing to act in bad faith in delaying in filing this motion.

**C.    This motion was filed at the earliest available opportunity.**

Defendant has not delayed in filing this motion. Defendant's substitution of attorney was filed with this court on August 6, 2020. Defense counsel then began meet and confer efforts with Plaintiffs' counsel in order to see if it was possible to stipulate to

3

Defendants' filing of an amended answer, filing of a cross-complaint, and to consolidate the two cases CIVDS1931160 and CIVDS1931182. (Hartsock Declaration at ⁋3.) The Parties were able to come to an agreement to stipulate to consolidate the two cases and are close to an agreement to stipulate to Defendant Amending her Answer, but not to the filing of the Cross-Complaint. (Hartsock Declaration at ⁋4).

Once it was clear that meet and confer efforts to stipulate to the filing of Defendant's proposed Cross-Complaint were extinguished, defense counsel secured the Court's next available hearing date for this motion (Hartsock Declaration at ⁋5).

## III. CONCLUSION

In the interest of justice, defendant respectfully requests an order from this Court deeming the cross-complaint attached as Exhibit A to be deemed filed as of the date of granting this motion. This motion was brought as soon as defendant was aware of the claims available to her and any failure to file a cross-complaint earlier resulted only from defendant's mistaken belief regarding her available claims, excusable neglect. A hearing date requesting leave to file Defendant's cross-claims was secured as soon as attempts to meet and confer with Plaintiffs' counsel were extinguished.

Date:   November 10, 2020            LAW OFFICE OF MONICA HARTSOCK

By: _____
MONICA HARTSOCK
Attorney for Defendant Aleksia Lindsay (fka Aleksia Hepner)

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

1

1   Monica Hartsock, SBN 270114
2   **LAW OFFICE OF MONICA HARTSOCK**
    4562 Hastings Ct.
3   Chino, California 91710
    Telephone: (909) 536-1773
4   Monica@Hartsocklawfirm.com

5   Attorneys for Defendant & Cross-Complainant,
    Aleksia Lindsay (erroneously sued as Aleksia Hepner)
6

7                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                      FOR THE COUNTY OF SAN BERNARDINO

9

10  NATIONAL COLLEGIATE STUDENT          Case No. CIVDS1931160
    LOAN TRUST 2007-1, A Delaware         **[-----PROPOSED------]**
11  Statutory Trust and NATIONAL          **DEFENDANT ALEKSIA LINDSAY fka**
    COLLEGIATE STUDENT LOAN               **ALEKSIA HEPNER'S CROSS-**
12  TRUST 2007-2, A DELAWARE              **COMPLAINT AGAINST PLAINTIFF &**
    STATUTORY TRUST                       **CROSS-DEFENDANTS:**
13
                    Plaintiff,            **Class Action**
14
           vs.                            REQUEST FOR JURY TRIAL
15
    ALEKSIA M HEPNER and DOES 1-
16  15, inclusive

17                  Defendants.

18
    ALEKSIA LINDSAY on her own behalf
19  and on behalf of other similarly
    situated persons,
20
                    Cross-Complainant
21
           vs.
22
    NATIONAL COLLEGIATE STUDENT
23  LOAN TRUST 2007-1 and NATIONAL
    COLLEGIATE STUDENT LOAN
24  TRUST 2007-2, DELAWARE
    STATUTORY TRUSTS On Their Own
25  Behalf And On Behalf Of Other Trusts
    Similarly Situated; TRANSWORLD
26  SYSTEMS, INC., U.S. BANK, N.A.,
    ASSET RECOVERY SOLUTIONS,
27  LLC; AND ROES 1-20, INCLUSIVE,

28                  Cross-Defendants

                        **CROSS- COMPLAINT**

1   DEFENDANT AND CROSS-COMPLAINANT, ALEKSIA LINDSAY fka ALEKSIA

2 HEPNER ("Lindsay"), on her behalf and on behalf of similarly situated persons ("Class

3 Claimants"), hereby alleges and cross-complains against National Collegiate Student Loan

4 Trust 2007-1 and National Collegiate Student Loan Trust 2007-2, Delaware Statutory

5 Trusts On Their Own Behalf And On Behalf Of Other Trusts Similarly Situated;

6 Transworld Systems, Inc., U.S. Bank, N.A., Asset Recovery Solutions, Llc; And Roes 1-

7 20, Inclusive as follows:

8             **<u>SUMMARY</u>**

9   1. The Cross-Defendants and the proposed Defendants Class have worked

10 together and collectively orchestrated to collect and attempt to collect allegedly owed

11 debts.

12   2. This action concerns the unlawful actions including the debt collection

13 practices of  the Cross Defendants National Collegiate Student Loan Trust 2007-1 and

14 National Collegiate Student Loan Trust 2007-2 and the other National Collegiate Student

15 Loan Trusts included in the Defendant Class  (the "Trusts") through Transworld Systems,

16 Inc. ("Transworld") and Asset Recovery Solutions, LLC ("ARS") on behalf of U.S. Bank,

17 National Association ("US Bank"). Collectively, the Trusts, Transworld, ARS and US Bank

18 are referred to herein as Cross-Defendants. Specifically, the Cross-Defendants knew but

19 recklessly disregarded Lindsay and Class Claimants as follows:

20      a. The Cross-Defendants do not have the right to collect any sums from the

21        Lindsay and the Class Claimants because the accounts they sought to

22        collect on do not have the documentation necessary to prove the Trusts'

23        ownership of the loans.

24      b. The Cross-Defendants do not have the right to flood the courts with

25        consumer debt collection actions, under the color of law, based upon

26        records they know are unreliable and are otherwise contaminated with

27        inaccurate information with the hopes that people they sue will not be

28        able to defend themselves and the courts will permit the unlawful

collection practices to continue. The Cross Defendants are barred by collateral estoppel to rely on affidavits of persons who lack personal knowledge to support their lawsuits but continue to do so.

   c. With this knowledge, as part of their pattern and practice related to their unfair, deceptive, or otherwise unconscionable debt collection practices, Cross-Defendants act through their affiliates and authorized agents to collect and attempt to collect on the hundreds of thousands of purported consumer debts that they acquire for pennies on the dollar of what they claim is due.

3. The debts that Cross-Defendants are attempting to collect are (i) nongovernmental loans, (ii) that originated for borrowers and co-borrowers.

4. As a direct and proximate cause of the Cross-Defendants' acts and omissions, Lindsay and Class Claimants have sustained damages and losses in the form of incurred out of pocket expenses to determine their rights and responsibilities about whether the debt is legally owed. Lindsay and Class members have made payments to Cross-Defendants that were not legally owed or collected in compliance with applicable debt collection laws. Lindsay and Class members are also entitled to statutory damages.

## PARTIES AND VENUE

5. Defendant and Cross-Complainant, Aleksia Lindsay fka Aleksia Hepner (referred to herein as "Lindsay" or "Defendant") was at all times relevant to this action, a natural person residing in Rancho Cucamonga, California.

6. Cross-Defendants National Collegiate Student Loan Trust 2007-1 and National Collegiate Student Loan Trust 2007-2 and the other National Collegiate Student Loan Trusts included in the Defendant Class (the "Trusts") are Delaware statutory trusts, formed and existing pursuant to the laws of the state of Delaware, allegedly for the purpose of acquiring purported consumer debts.

7. The "Defendant Class" consists of the other National Collegiate Student Loan

2

Trusts.  Upon information and belief each member of the Defendant Class has filed an action before this Court.

8.      Cross-Defendant Transworld Systems, Inc. ("Transworld" & "TSI") is a debt collector. As a debt collector it is aware of the laws that regulate its collection activities, both state and federal, and require it to be truthful and accurate in all of its collection efforts. TSI acts as a debt collector on behalf of U.S. Bank for the Trusts, including the Defendant Class of Trusts that collectively own hundreds of thousands of purported private student loans, when in fact they are not qualified student loans, with a face value of approximately $12 billion) and is engaged in the business of a collection agency using the mail and telephone, the primary purpose of which is to collect consumer debts allegedly owed to others. Transworld also appears to be engaged in the unauthorized practice of law controlling and directing the writings and other actions of attorneys it hires for the Cross Defendants. Transworld is a California corporation with its principal place of business in Pennsylvania, with offices in California and doing business in California and in San Bernardino County. In addition:

  a.  Transworld is a debt collector as defined in the FDCPA and has provided services in connection with collecting defaulted debt owed to the Trusts on the alleged consumer loan accounts of Lindsay and putative class members at a time when the consumers were in default. Among the debts Transworld collects are purported "private student loans" allegedly owed to the Trusts.

  b.  Transworld is managed by a Board of Directors.

  c.  Transworld's duties as special subservicer to the Trusts are set forth in an agreement with the Trusts' special servicer. The terms of the agreement and multiple amendments provide that Transworld "shall administer, manage and oversee collection litigation," "shall be responsible for selecting and directly supervising collection attorneys," and "shall review all complaints and affidavits utilized by" attorneys

3

retained by Transworld on behalf of the Trusts, all "with the goal of maximizing the collection of amounts payable on" the loans owned by the Trusts.

d. On September 15, 2017, the CFPB issued a Consent Order in the matter of Transworld Systems, Inc. as agent for the Collective NCSLT Trusts, filing it as 2017-CFPB-0018. A copy of which is Exhibit A, hereto.

1. That Consent Order was issued specifically as to Transworld's unfair and deceptive acts and practices on behalf of, or in the name of, the NCSLT Trusts. The Consent Order is both remedial and mandatory, and identified and prohibited many of the unfair and deceptive acts and practices of Transworld on behalf of, or in the name of, the NCSLT Trusts identified above.

2. In the Consent Order, the CFPB found that Transworld and its nationwide network of law firms committed a number of offenses between November 1, 2014 and April 25, 2016, including:

a. Filing tens of thousands of collections lawsuits against borrowers in which they did not possess the complete documentation needed to prove the NCSLT Trusts owned the loans;

b. Filing tens of thousands of affidavits in support of collections lawsuits in which the affiant swore they had personal knowledge of the debt, when in fact the affiants frequently merely reviewed data on a computer screen, did not know the source of the data or how it was collected and maintained, and lacked

4

1  knowledge of the chain of assignment records
2  necessary to prove that the relevant Trust owned the
3  loans;

4  c.  Filing numerous lawsuits without the intent or
5  ability to prove the claims, if contested.

6  3.  The Consent Order further found that these acts constituted
7  violations of the Consumer Financial Protection Act, 12 U.S.C.
8  §§ 5531(a), 5536(a)(1)(B).

9  e.  On September 11, 2020, the New York Attorney General issued an
10  Assurance of Discontinuance concerning Transworld Systems, Inc. that
11  addresses TSI's practices including the control and direction they assert
12  over the Attorney Network and TSI made or caused to be made false,
13  misleading and deceptive statements in formal documents filed in
14  lawsuits filed in the name of the Trusts.  See Exhibit B.

15  f.  To carry-out part of its consumer collections business, it also operates
16  and manages an Attorney Network business unit, which includes
17  Patenaude & Felix, A.P.C. that files debt collection lawsuits in California
18  and nationwide to collect on behalf of the NCSLT Trusts, and is Plaintiffs'
19  counsel in this lawsuit.

20  9.  Cross-Defendant Asset Recovery Solutions, LLC ("ARS") is another debt
21  collector.  As a debt collector it is aware of the laws that regulate its collection activities,
22  both state and federal, and require it to be truthful and accurate in all of its collection
23  efforts. which acts on behalf of U.S. Bank for the Trusts and is engaged in the business of
24  a collection agency using the mail and telephone to collect consumer debts allegedly owed
25  to others. ARS is a limited liability corporation with more than one manager chartered
26  under California law, with offices in California and doing business in California and in San
27  Bernardino County. In addition:

28  a.  ARS is a debt collector as defined in the FDCPA. Among the debts ARS

collects are "private student loans" allegedly owed to the NCSLT Trusts.

b. ARS is managed by Jeffrey Mortis and Jonathan Starkenburg.

10. Cross-Defendant U.S. Bank National Association does business in San Bernardino County and serves as the "indenture trustee" for the Trusts. U. S. Bank's role in the trusts is not related to its consumer banking activities. U.S. Bank has knowledge of the California laws regulating its debt collection activities.

11. U.S. Bank, is also the Special Servicer for the Trusts, and has certain non-delegable responsibilities to assure that its actions and the actions of any person it delegates performance of its duties to are done properly and in compliance with applicable law. U.S. Bank has assigned performance of collection efforts that it responsible for, as Special Servicer, negligently, to a company named Turnstile Capital Management, LLC ("Turnstile"). US Bank, directly or through its authorized agent Turnstile, had the duty to properly supervise and control the activities of Transworld and its Attorney Network and ARS, and for breach of that duty is primarily liable since it cannot delegate away its responsibilities. The delegation of performance of duties to others does not relieve U.S. Bank of its obligations. Alternatively, U.S. Bank is vicariously liable for the torts and other wrongful conduct committed against Lindsay and Class Claimants in California by Transworld and/or its Attorney Network and ARS.

12. Asserting gross negligence and other actionable wrongful conduct, the NCSLT Trusts, by way of a Verified Amended Complaint filed in Delaware Chancery Court against U S. Bank, sued U.S. Bank, Turnstile, and GSS Data Services, Inc. and made, among others, the following allegations which, on information and belief, after investigation, Plaintiff asserts are accurate, and on information and belief reallege:

a. ¶45:"Neither the Trusts nor the Owners approved these arrangements with Turnstile or with Transworld. To the contrary, the Owners specifically informed the Administrator and U.S. Bank that they did not want Turnstile or TSI to perform any services relating to the Trusts. But

the Administrator and U.S. Bank refused to follow the instructions from the Owners. The Trust did not hire Turnstile or TSI, neither Turnstile nor TSI acts at the direction of the Trusts, and they do not follow any directions or instructions issued by the Trusts. To the contrary, as discussed below, while the Owners of the Trusts have requested that TSI cease filing lawsuits in the name of the Trusts where TSI cannot prove that the Trusts have standing to collect on defaulted loans, TSI as nevertheless continued to file such lawsuits"

b. ¶46 "To the contrary, TSI is an agent of U.S. Bank as Special Servicer. Under the Special Servicing Agreement, U.S. Bank was responsible for 'the enforcement, collection and servicing of Delinquent Loans and Defaulted Loans        "

c. ¶47 "U.S. Bank's duties further included monitoring the performance of Tunstile and replacing it if it was deficient or negligent in performing its duties. As set forth herein, Turnstile's performance of its duties was deficient and negligent, but U.S. Bank failed to monitor Turnstile's performance and failed to replace Turnstile as Subservicer.

13.   The remainder of the allegations as they pertain to U.S. Bank in said Verified Amended Complaint establish that U.S. Bank was in a position and responsible to prevent and avoid the unfair and deceptive acts and practices performed by Transworld, the attorneys from Transworld's Attorney Network and ARS, that U.S. Bank knew of and was fully informed about said unfair and deceptive acts and practices being performed, that U.S. Bank had a duty to prevent and avoid such unfair and deceptive acts and practices, and that U.S. Bank negligently and/or grossly negligently and/or intentionally, failed to prevent such unfair and deceptive acts and practices, and in fact aided and abetted the commission of such unfair and deceptive acts and practices by Transworld, Transworld's Attorney Network and ARS on behalf of the NCSLT Trusts.

14. U.S. Bank is also responsible for the wrongful conduct of Transworld,

7

Transworld's Attorney Network and ARS in California and elsewhere under the doctrine of respondeat superior.

15.   The true names, capacities and nature and extent of participation in the alleged activities complained of herein by ROES 1-20, inclusive, are currently unknown to Cross-Complainant. Therefore, Cross-Complainant sues these Cross-defendants by such fictitious names and will amend the Cross-Complaint to allege their true names and capacities when ascertained.

16.   Each of the Cross-Defendants, whether actually named or fictitiously named, was the agent of the other cross-defendants, whether actually named or fictitiously named, and was at all times acting within the purpose and scope of such agency.

17.   The violations of law hereinafter described have been committed in the State of California. The Cross-Defendants regularly conduct business and supply products to buyers throughout this state and specifically within the County of San Bernardino. Therefore, jurisdiction and venue are proper within this Court.

## FACTS COMMON TO ALL CAUSES OF ACTION

18.   In January, 2007, Lindsay, with her mother as a co-signor, entered a credit agreement with Bank of America to borrow $30,000 to cover education expenses associated with the California Culinary Academy. The APR was 12.207% variable rate based upon LIBOR which is adjusted monthly. The now defunct California Culinary Academy that represented to Lindsay and others that it was a legitimate school and she would have many job options with generous salaries upon graduation. She was also told that her earned school credits would easily transfer if she ever wanted to transfer schools.

19.   In May, 2007, Lindsay with her mother as a co-signor, entered a second credit agreement with Bank of America to borrow another $30,000 to cover education expenses associated with the California Culinary Academy. This loan was at 12.334% APR variable rate based upon LIBOR which is adjusted monthly.

20.  Soon thereafter, in 2007, a class action lawsuit (*Amador v. California Culinary Academy*) was filed. One allegation was that the school inflated job placement rates by

8

counting as successful post-culinary school placements jobs that would have been available without going to culinary school at all. The complaint in its various iterations, with detailed allegations, is available from the San Francisco Superior Court, Case No. CGC-07-467710. The case settled in 2012 and the school was permanently closed in 2017.

21.  Defendant's co-signor, her mother, tried to make some payments on the loans, but ultimately fell behind and the loans went into default.  Subsequent to the default, the servicing and collection of the purported loans was transferred to Transworld and ARS who attempted to collect the loans.

22.  Even though the defaults on the loans had occurred previously, the last payment on the loans was made on October 6, 2016.

23.  On February 1, 2019, ARS on behalf of the Trusts who sued her sent two letters demanding payment.

24.  Lindsay asked for validation of the outstanding debt and on October 14, 2019, Transworld responded asking Lindsay to contact Patenaude & Felix and providing a copy of the credit agreements and Loan History Payment Reports that appear incomplete and inaccurate. The documentation did not include any billing statements or any payment history prior to the alleged default. There are three separate charts with various interest rates – 7.66%, 6.99%, and 6.75%.

25.  On January 23, 2020, the 20071 and 2007-2 Trusts filed lawsuits in San Bernardino Court against Lindsay, Case No. CIV DS1931160 and Case No. CIV DS1931182 for Collection and Breach of Contract for an amount totaling $94,237.46.

26.  In the 2007-1 and 2007-2 Trusts' lawsuits against Lindsay, they represented that she entered into a written contract with Bank of America, N.A. when no such contract exists.

27.  In Case No. CIV DS1931160, the 2007-1 Trust and their agents represented that Lindsay owed a principal sum of $45,596.60 while at the same time claiming that the basis for the debt was a document which would have a limited principal of $30,000.00, if it had even been completed.

28. In Case No. CIV DS19311882, 2007-2 Trust and their agents represented that Lindsay owed a principal sum of $48,640.86 while at the same time claiming that the basis for the debt was a document which would have a limited principal of $30,000.00, if it had even been completed.

29. The amount in controversy exceeds TWENTY-FIVE THOUSAND DOLLARS ($25,000.00), exclusive of interest and costs, for which Lindsay seeks a judgment individually and on behalf of a class against Cross-Defendants, together with equitable relief. In addition, Lindsay seeks damages from Cross-Defendants, and each of them, for incidental, consequential, exemplary, and actual damages including interest, costs, and actual attorneys' fees for herself and on behalf of a class.

## **THE DEFENDANTS CLASS**

30. This action is asserted under CCP §382 against a Defendants Class consisting of the 2007-1 and 2007-2 Trusts, who sued Lindsay, and the other NCSLT Trusts that also sue borrowers claiming to be the owners of certain loans.

31. The actions and inactions of all of the NCSLT Trusts are the same since they are all coordinated and directed by the same entities as set forth above.

32. It is impractical to join all of the Trusts in this action.

33. The claims asserted against the 2007-1 and 2007-2 Trusts are the same claims that can be asserted against the Defendants Class and present common issues of law and fact.

34. The claims against the 2007-1 and 2007-2 Trusts are typical of the claims asserted against the Defendants Class.

35. The 2007-1 and 2007-2 are adequate as representatives of the Defendants Class since they have the same interests as other members of the Defendants Class and its actions and inactions are controlled by the same entities. The counsel are also adequate and the Defendants Class would retain the same counsel.

///

///

10

1

**THE CLASS CLAIMANTS**

2      36. The Class Claimants consists of Lindsay and all California residents who have

3  been pursued by debt collectors or TSI's Attorney Network or sued by the 2007-1 and

4  2007-2 Trusts and the Defendants Class defined above.

5      37. It is impractical to join all of the members of the Class Claimants in this action.

6      38. Lindsay's claims against the 2007-1 and 2007-2 Trusts and the Defendants

7  Class raise common issues of law and fact.

8      39. Lindsay's claims are typical of the Class Claimants.

9      40. Lindsay is an adequate representative. She does not have any interests

10  antagonistic to the Class Claimants.

11      41. Lindsay has retained counsel that are adequate to represent the interests of the

12  Class Claimants.

13

**FIRST CAUSE OF ACTION**

14  **By Lindsay and the Class Claimants for Violation of the Rosenthal Fair Debt**

15  **Collection Practices Act**

16  **California Civil Code §1788, *et seq.***

17  **Against Plaintiff and all Cross-Defendants**

18      42. Lindsay realleges each and every paragraph and incorporates them by this

19  reference as though fully set forth herein.

20      43. Cross-Defendants are "debt collectors" within the meaning of California Civil

21  Code §1788.2(c) because they regularly engage in debt collection. The monies allegedly

22  owed by Cross-Complainant are "debts" within the meaning of California Civil Code §

23  1788.2(d) arising from consumer credit transactions primarily for personal, household or

24  family purposes.

25      44. U.S. Bank as an indenture trustee had a responsibility to assure that its actions

26  and the actions of any person it delegated performance of collection activities to complied

27  with the laws. U.S. Bank is responsible for any actions or inactions taken by any person it

28  assigned duties to that violated the law.

45. California's Rosenthal Fair Debt Collections Practices Act ("Rosenthal Act") incorporates by reference and requires compliance with the provisions of the federal Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq*. (California Civil Code §1788.17)

46. As set forth above, Cross-Defendants violated fair debt collection laws by:

- Making false representations concerning the character, amount, or legal status of any debt in asserting that the alleged debt is owed by Cross-Complainant (15 U.S.C. §1692(e)(2));

- Making false representations or using deceptive means to collect or attempt to collect on any debt (15 U.S.C. §1962(e)(10)).

- Using unfair or unconscionable means to collect or attempt to collect any debt, including collecting amounts which were not expressly authorized by the agreement creating the debt or permitted by law (15 U.S.C. §1692(f)(1)).

47. The Cross Defendants have also collectively violated California Civil Code §1788.13(i) which prohibits the use of false representations concerning the nature of services or business being rendered by the debt collector.

48. Under California Civil Code §§ 1788.30 and 1788.17, Cross-Complainant is entitled to recover actual damages sustained as a result of Cross-Defendants' violations of the Rosenthal Act. Such damages include, without limitation, monetary losses and damages, which damages are in an amount to be proven at trial. In addition, under California Civil Code §§ 1788.30 and 1788.17, because Cross-Defendants violation of the Rosenthal Act were committed willfully and knowingly, Cross-Complainant is entitled to recover penalties of at least $1,000 per violation as provided for in the Rosenthal Act.

49. Cross-Complainant is also entitled to an award of attorneys' fees and costs pursuant to California Civil Code §1780.30.

///

///

///

///

12

**SECOND CAUSE OF ACTION**

**By Lindsay and the Class Claimants for Unfair Competition, Unlawful**

**Business Acts and Practices**

**Business and Professions Code §17200**

**Against Plaintiff and all Cross-Defendants**

50. Lindsay realleges each and every paragraph and incorporates them by this reference as though fully set forth herein.

51. U.S. Bank as an indenture trustee had a responsibility to assure that its actions and the actions of any person it delegated performance of collection activities to complied with the laws. U.S. Bank is responsible for any actions or inactions taken by any person it assigned duties to that violated the law.

52. For the reasons discussed above, Cross-Defendants violated and continue to violate the UCL by engaging in the above stated and prohibited unlawful, unfair, fraudulent, deceptive, untrue, and misleading acts and practices as part of their collection and attempted collection of debts that have previously been adjudicated.

53. As alleged, Cross-Complainant has suffered injury in fact and lost money or property as a result of Cross-Defendants conduct, including because she paid money to appear to defend herself in this action.

54. Cross-Defendants above presented wrongful acts and practices also constitute unlawful, unfair and fraudulent business practices within the meaning of the UCL.

55. California Business and Professions Code §17200 prohibits any "unlawful...business act or practice." Cross-Defendants' wrongful acts and practices constitute "unlawful" business act and practices by continuously attempting to collect upon alleged debts through the judicial process when this Court has already adjudicated the issue and violating the doctrine of Res Judicata, California Civil Code section 1788.17 and 15 U.S.C. §§1692(e)(2), 1692(e)(10), and 1692(f)(1).

56. California Business & Professions Code § 17200 prohibits any "unfair . . . business act or practice." Cross-Defendants' acts, omissions, misrepresentations, and

13

practices as alleged herein also constitute "unfair" business acts and practices within the meaning of the UCL in that their conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Cross-Defendants' legitimate business interests, other than the conduct described herein.

57. Cross-Defendants' above-described wrongful acts and practices also constitute "fraudulent" business acts and practices in that the representations and omissions described herein are false, misleading and/or likely to deceive reasonable consumers into believing they had to defend themselves in an action of which was already adjudicated.

58. Cross-Defendants unlawful, fraudulent, and unfair business acts and practices continue to this day and are ongoing. As a direct and/or proximate result of Cross-Defendants' unlawful, unfair, and fraudulent practices, Cross-Complainant has suffered injury and in fact lost money for which she is entitled to judgment and equitable relief against Cross-Defendants, as set forth in the Prayer for Relief.

59. Additionally, under Business & Professions Code § 17203, Cross-Complainant seeks an order and injunction requiring Cross-Defendants to immediately cease such acts of unlawful, unfair, and fraudulent business practices.

### **THIRD CAUSE OF ACTION**

### **By Lindsay and the Class Claimants for Violation of the Fair Debt**

### **Collection Practices Act**

### **15 U.S.C. §1692, *et seq.***

### **Against Cross-Defendants TSI and ARS**

60. Lindsay incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

61. Defendants TSI and ARS violated the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e, which prohibits debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any

14

debt.

62. Defendants TSI and ARS violated 15 U.S.C. § 1692e(2)(A) by misrepresenting the character, amount or legal status of the loan amount.

63. Defendants TSI and ARS violated 15 U.S.C. § 1692e(5) by threatening to take any action which cannot be legally taken.

64. Defendants TSI and ARS violated 15 U.S.C. § 1692e(8) through the false representation of information to others.

65. In addition to the above violations of specific provisions of 15 U.S.C.§1692e, Cross-Defendants TSI and ARS means to collect the debts by actually filing actions which they had no ability to support through competent and admissible evidence violated 15 U.S.C. § 1692f that prohibits using unfair or unconscionable means to collect or attempt to collect any debt.

66. TSI, with the approval of U.S. Bank, has also engaged counsel under terms of which allow it to engage in the practice of law when it is not licensed to engage in the practice of law in the state of California.

67. As a result of Cross Defendants TSI and ARS violations of 15 U.S.C. § 1692, et seq., Lindsay and the Class Claimants were damaged because they were forced to incur sums to defend and investigate such unlawful actions. Thus, they are entitled, pursuant to 15 U.S.C. § 1692k, to actual damages, statutory damages, and the costs of the action, together with attorney's fees.

**FOURTH CAUSE OF ACTION**

**By Lindsay and the Class Claimants for Declaratory Relief**

**Against Plaintiff and all Cross-Defendants**

68. Lindsay incorporates by reference each and every allegation set forth in the preceding paragraphs of this Complaint

69. A controversy has arisen and now exists between Lindsay and the Class Claimants and Cross-Defendants. The controversy between the parties concerns the ability of Cross-Defendants to collect on the debt at issue. Lindsay contends that Cross-

15

1   Defendants are barred from bringing cases against Lindsay and Class Claimants under the

2   doctrine of collateral estoppel because the Cross-Defendants rely on insufficient evidence

3   that has been held to be insufficient by a final state court judgment. Despite this ruling,

4   the Cross-Defendants continue to act in contravention of this ruling including by filing this

5   action and others against Class Claimants.

6       70. Lindsay requests a judicial determination of her rights and the rights of the

7   Class Claimants and a declaration that the Cross-Defendants are estopped to collect debts

8   against Lindsay and the Class Claimants.

9

10   **<u>PRAYER FOR RELIEF</u>**

11       WHEREFORE, Lindsay prays for judgment individually and on behalf of the Class

12   Claimants against all Cross-Defendants, and each of them, as follows:

13   A. Certify the Class Claimants as a class under CCP §382 and appoint Lindsay as class

14       representative and her counsel as Class Counsel for the Class Claimants;

15   B. Certify the Defendants Class as a class under CCP §382 and appoint the 2007-1 and

16       2007-2 Trusts as class representative and their counsel as Class Counsel for the

17       Defendants Class;

18   C. Award of actual and punitive damages;

19   D. Award civil penalties;

20   E. Award restitution;

21   F. Award declaratory and injunctive relief, enjoining Cross-Defendants from

22       continuing the unlawful practices as set forth herein and directing Cross-

23       Defendants to identify, with Court supervision, victims of its conduct and pay them

24       restitution and disgorgement of all monies acquired by Cross-Defendants by means

25       of any act or practice declared by this Court to be wrongful;

26   G. Award statutory penalties;

27   H. Award attorneys' fees and costs; and

28   I. For such other relief that the Court deems just and proper under the circumstances.

16

1

2   Date:   November 10, 2020          LAW OFFICE OF MONICA HARTSOCK

3

4                                      By: _____

5                                      MONICA HARTSOCK
                                       Attorney   for   Defendant   and   Cross-
6                                      Complainant Aleksia Lindsay (fka Aleksia
                                       Hepner)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

**Cross- Complaint**

**DEMAND FOR JURY TRIAL**

     Please take notice that Lindsay on behalf of herself and the putative class demands a jury in this action.

Date:  November 10, 2020         LAW OFFICE OF MONICA HARTSOCK

By: _____

MONICA HARTSOCK
Attorney for Defendant and Cross-Complainant Aleksia Lindsay (fka Aleksia Hepner)

18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# EXHIBIT A

27
28

UNITED STATES OF AMERICA

CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING File

2017-CFPB-0018

|  |  |
|---|---|
| In the Matter of:<br><br>**TRANSWORLD SYSTEMS, INC.** | **CONSENT ORDER** |

## I.

## Overview

The Consumer Financial Protection Bureau (Bureau) has reviewed the debt

collections litigation practices of the Attorney Network business unit of Transworld

Systems, Inc. ("TSI") ("Respondent"), the agent and Service Provider for fifteen (15)

Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts

("NCSLTs", or "the Trusts", which are the National Collegiate Master Student Loan

Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2,

NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4,

NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4), and has identified

violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act

of 2010 (CFPA). Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the

Bureau issues this Consent Order (Consent Order).

To collect on defaulted private student loans, Law Firms engaged by

Respondent's Attorney Network business unit filed debt Collections Lawsuits in state

1

courts across the country on behalf of the Trusts. In support of many of these lawsuits, Respondent executed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, since November 1, 2014, Law Firms hired by Respondent filed hundreds of debt Collections Lawsuits without the documentation necessary to prove Trust ownership of the loans.

## II

## Jurisdiction

1.    The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## III
## Stipulation

2.    Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated September 14, 2017 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## IV
## Definitions

2

3.      The following definitions apply to this Consent Order:

a.   "Affiant" means any signatory to an Affidavit, signing in his or her capacity as an employee or agent of Respondent, but excluding one signing solely as a notary or witness to the act of signing.

b.   "Affidavit" means any sworn statement filed with a court in connection with a Collections Lawsuit.

c.   "Board" means TSI's duly elected and acting Board of Directors.

d.   "Clearly and Prominently" means:

   i.   as to written information: written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer; if the information is contained in a multi-page print document, the disclosure appears on the first page.

   ii.   as to information presented orally: spoken and disclosed in a volume, cadence, and syntax sufficient for an ordinary consumer to hear and comprehend.

e.   "Collections Lawsuits" means attempts by a Law Firm engaged by Respondent's Attorney Network business unit, for an account owned or alleged to be owned by a Trust, through judicial processes in the United States of America, to collect or establish a Consumer's liability for a Debt.

f.   "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

g.   "Debt" means any obligation or alleged obligation of a Consumer to pay
money arising out of a transaction in which the money, property, insurance,
or services which are the subject of the transaction are primarily for personal,
family, or household purposes, whether or not such obligation has been
reduced to judgment.

h.   "Effective Date" means the date on which the Consent Order is issued.

i.   "Enforcement Director" means the Assistant Director of the Office of
Enforcement for the Consumer Financial Protection Bureau, or his/her
delegate.

j.   "Law Firm" means a law firm engaged by Respondent's Attorney Network
business unit to collect student loan Debt on behalf of the National Collegiate
Student Loan Trusts.

k.   "Regional Director" means the Regional Director for the Northeast Region for
the Office of Supervision for the Consumer Financial Protection Bureau, or
his/her delegate.

l.   "Related Consumer Action" means a private action by or on behalf of one or
more consumers or an enforcement action by another governmental agency
brought against Respondent based on substantially the same facts as
described in Section V of this Consent Order.

m.   "Relevant Period" includes the period from November 1, 2014 to April 25,
2016.

n.   "Respondent" means Transworld Systems, Inc., and its successors and
assigns.

4

o. "Service Providers" means any service provider, as defined in section 1002(26) of the CFPA, 12 U.S.C. § 5481, that provides or provided services with respect to the servicing of the student loans owned by a NCSLT.

## V.

## Bureau Findings and Conclusions

The Bureau finds the following:

4. The National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts") comprise fifteen (15) Delaware statutory trusts created between 2001 and 2007. The basic purpose of each Trust is to acquire a pool of student loans, enter into the so-called trust-related agreements, and provide for the administration of the Trusts and the servicing of student loans.

5. The Trusts do not have any employees and all actions taken by the Trusts in connection with loan servicing and collecting Debt are carried out by third parties.

6. Debt-collection activities on behalf of the Trusts are carried out by the successor special servicer's sub-servicer pursuant to servicing agreements with the successor special servicer.

7. Sub-servicers that executed and notarized the deceptive affidavits did so as Service Providers and agents of the Trusts.

8. Law Firms that filed lawsuits on behalf of the Trusts did so as Service Providers and agents of the Trusts.

9.    Respondent Transworld Systems, Inc. (TSI) is incorporated under the laws
      of the State of California and maintains a principal place of business in Ft.
      Washington, Pennsylvania.

10.   TSI maintains an office in Peachtree Corners, Georgia, where its employees
      execute and notarize affidavits for Collections Lawsuits brought on behalf of
      the Trusts.

11.   A national network of Law Firms engaged by Respondent file and prosecute
      Collections Lawsuits on behalf of the Trusts in courts across the country.

12.   TSI has operated as the successor sub-servicer to the successor special
      servicer of the Trusts since November 1, 2014.

13.   TSI is a "covered person" under 12 U.S.C. § 5481(6) because it is engaged in
      the collection of debt and is a Service Provider. 12 U.S.C. § 5481(15)(A)(x),
      (26).

14.   TSI is an agent and Service Provider of the Trusts.

### FALSE AND MISLEADING AFFIDAVITS AND TESTIMONY

15.   In connection with collecting or attempting to collect Debt from Consumers,
      between November 1, 2014 and April 25, 2016, Law Firms hired by
      Respondent on behalf of the Trusts initiated 37,689 Collections Lawsuits in
      courts across the country on behalf of the Trusts.

16.   In support of the Collections Lawsuits, Law Firms submitted Affidavits
      executed by Respondent and documents in support of the Trusts' claims
      that Consumers owed Debts to a Trust.

17.   Respondent executed and notarized Affidavits–often with attached
      exhibits–that were used by Law Firms in many of the Collections Lawsuits

6

brought on behalf of the Trusts between November 1, 2014 and April 25, 2016.

18.   In these Affidavits, the Affiants swore that they had personal knowledge of the education loan records evidencing the Debt. In fact, in numerous instances, Affiants lacked personal knowledge of the education loan records evidencing the Debt when they executed the Affidavits.

19.   The Affiants also asserted that they were authorized and competent to testify about the Consumers' Debts through review of and "personal knowledge" of the business records, including electronic data in their possession. In fact, in certain instances, Affiants lacked personal knowledge of the business records, including the electronic data, showing that Consumers owed Debts to the Trusts. Affiants were instructed to review certain data on a computer screen as part of an effort to verify some information in the Affidavits about the Debts. Affiants, however, did not always know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether that data meant that the Debt was in fact owed to the Trusts.

20.   Each Affiant also swore that he/she had "personal knowledge of the record management practices and procedures of Plaintiff [the Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents." In fact, certain Affiants lacked personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures the Trusts required of its loan servicers and other agents.

21.   In many Affidavits, the Affiants also stated that "I have reviewed the chain of title records as business records" regarding the relevant account. In some cases, Affiants did not possess the chain of title records but reviewed "chain of title" records that were found online on a government portal maintained by the Securities and Exchange Commission. In numerous instances, Affiants did not review the chain of title records prior to executing the Affidavits.

22.   In certain Affidavits, the Affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the plaintiff Trusts on dates certain. In fact, in numerous instances, Affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loans.

23.   In some instances, certain Affiants complained to supervisors that they did not have personal knowledge of the representations made in the Affidavits. These affiants continued to execute Affidavits, however, for fear of losing their jobs.

24.   Affiants also provided live testimony in court, purportedly based on personal knowledge, similar to the statements made in the Affidavits as described in Paragraphs 18-22.

### FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

25.   From November 1, 2014 to April 25, 2016, on behalf of the Trusts, Law Firms filed numerous Collections Lawsuits against Consumers even though

the complete documentation needed to prove that the Trusts owned the loans did not exist.

26.    In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to and owned by the Trust was lacking.

27.    In addition, Law Firms hired by Respondent on behalf of the Trusts filed numerous Collections Lawsuits where the loans in question were disbursed to the Consumers after the loans allegedly were transferred to the Trusts according to the chain of assignment documents.

28.    On numerous occasions, Law Firms hired by Respondent filed Collections Lawsuits even though the promissory note to prove that a Debt was owed did not exist.

29.    For each Collections Lawsuit described in Paragraphs 25-28, Law Firms hired by Respondent could not prove that a Debt was owed to the Trusts, if contested.

### Violations of the Consumer Financial Protection Act

30.    Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

31.    An act or practice is deceptive under the CFPA if it involves a material representation or omission that misleads, or is likely to mislead, a consumer acting reasonably under the circumstances.

32.    An act or practice is unfair if "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by

9

consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1).

## FALSE AND MISLEADING COLLECTION AFFIDAVITS AND TESTIMONY

33.   In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent executed Affidavits that were used by Law Firms with many of the Collections Lawsuits filed by Law Firms on behalf of the Trusts in courts across the country, and in live testimony, Respondent represented, directly or indirectly, expressly or by implication, that:

   a.   Affiants had personal knowledge of the account records and the Debt;

   b.   Affiants had personal knowledge of the chain of assignment records evidencing Trust ownership of the subject loan; and

   c.   Affiants had personal knowledge of the record management practices and procedures of the Trusts and all prior servicers.

34.   In fact, as described in Paragraphs 18 to 24, in numerous instances, these representations were either false or the Affiant did not have a basis for making the representation.

35.   The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a Collections Lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

36.    Thus, representations by Respondent, as described in Paragraphs 18-24, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

37.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent, acting through the Law Firms hired by Respondent on behalf of the Trusts, represented, directly or indirectly, expressly or by implication, that it could be proven in the Collections Lawsuits that the Trusts owned the loans in question and that the Consumers in question owed Debts to the Trusts, if contested.

38.    In fact, in numerous instances, Respondent lacked the complete chain of assignment documentation needed to prove Trust ownership of the subject loans and the promissory note needed to prove the existence of certain loans.

39.    The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

40.    Thus, Respondent's representations, as described in Paragraphs 25-29, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

41.    In addition, Respondent's acts and practices, caused or were likely to cause substantial injuries to consumers.

42.   The injuries to consumers included, but were not limited to, all payments made, including garnishments of wages and bank accounts, to settle Debts not enforceable.

43.   The injuries to consumers were not reasonably avoidable by consumers and were not outweighed by any countervailing benefits to consumers or to competition.

44.   Thus, Respondent's conduct, as described in Paragraph 25-29, constitutes unfair acts or practices in violation of sections 1031(c) and 1036(a)(1)(B ) of the CFPA, 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

## ORDER
## VI
## Conduct Provisions

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

45.   Respondent and its officers, Service Providers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, and must take the following affirmative actions:

   a.   Respondent shall take all actions necessary to comply with the terms of the Consent Order.

   b.   Respondent must require that any Law Firm it retains in connection with the collection of student loans owned by the Trusts agree to abide by the terms and conditions of the Consent Order.

   c.   Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed between November 1,

2014 and the Effective Date and that are missing the documentation described in subsection (f)(i)and (ii) of this Paragraph.

d.  Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed seeking Debt outside the statute of limitations and provide this information to the successor special servicer or any other Service Provider of the Trusts.

e.  Within one-hundred twenty (120) days of the Effective Date, Respondent must provide to the successor special servicer and to the Bureau for each Consumer named in the suits identified in Paragraph 45c and 45d: the Consumer's name, all available contact information for the Consumer (including information in the possession of the attorneys who filed the suit), and the total amount of all payments made by the Consumer on or after the date on which the suit was filed.

f.  Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not initiate a Collections Lawsuit to collect Debt unless Respondent possesses:

i.  the documentation necessary to prove that a Trust owns the loan, including but not limited to, documentation reflecting the complete chain of assignment from the Debt's originator to the specific Trust claiming ownership; and

ii.  a document signed by the Consumer, such as a promissory note, evidencing the agreement to pay the loan forming the basis of the Debt.

13

g.  Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to initiate a Collections Lawsuit to collect on a loan for which the applicable statute of limitations has expired.

h.  Respondent shall establish written policies requiring Law Firms to confirm that the applicable statute of limitations has not expired at the time of the filing of the Collections Lawsuit;

i.  Respondent shall require Law Firms to provide a quarterly report to Respondent that includes, for each Collections Lawsuit, any data relevant to determining the applicable statute of limitations, such as date of lawsuit, date of default, and date of last payment, as well as identifies any lawsuits in which a consumer alleges in his pleadings that the lawsuit was filed outside the statute of limitations.

j.  Respondent shall not collect any Debt through a Collections Lawsuit that Respondent knows or learns was filed outside the statute of limitations, and if any such cases are pending, Respondent shall seek the immediate withdrawal or dismissal of the lawsuit.

k.  Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to collect any Debt through

Collections Lawsuits that Respondent or its agents have any reason to believe may be unenforceable.

l.  Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, executing any Affidavit containing any misrepresentations, including false statements that:

i.  the Affiant is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

ii.  the Affiant has personal knowledge of the Consumer's debt;

iii.  the Affiant has personal knowledge of the loan's chain of assignment or ownership;

iv.   the Affiant has personal knowledge of the documents relating to the loan's chain of assignment or ownership;

v.  the Affidavit has been properly notarized if the Affidavit was not executed in the presence of a notary or if the notarization was otherwise not compliant with applicable notary laws; or

vi.  certain documents or records concerning the Debt forming the basis of the Collections Lawsuit have been reviewed by the Affiant.

46.  Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any

15

of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, providing any testimony that contains any misrepresentations, including false statements that the witness:

a. is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

b. has personal knowledge of the Consumer's debt;

c. has personal knowledge of the loan's chain of assignment or ownership; or

d. has personal knowledge of the documents relating to the loan's chain of assignment or ownership.

47. If Respondent determines that it engages in any conduct prohibited by this Order, including but not limited to Paragraphs 45-46 of this Order, Respondent promptly will take the necessary steps to ensure that it ceases any and all practices that violate this Order.

48. Within ten (10) days of making the determination described in Paragraph 47 Respondent must submit to the Regional Director a report detailing (a) the practices that violate the Order, (b) the specific agents engaged in the practices in question, and (c) a plan to ensure that the practices cease and to remediate any harm resulting from the practices.

49. With regard to pending Collections Lawsuits filed by a Law Firm in which Respondent executed an Affidavit that was filed in support of the pending Collection Lawsuit and that contains any misrepresentations—including but

not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to withdraw such Affidavit unless the Trusts dismiss the suit in which the Affidavit was filed. Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to notify the court of the following in writing and must also simultaneously provide the court with a copy of the Consent Order entered into between the Bureau and the Respondent: "Plaintiff withdraws the affidavit of [insert name of Affiant] pursuant to Consent Order entered into by the Consumer Financial Protection Bureau and Transworld Systems, Inc."

50. With regard to Collections Lawsuits that were filed in which Respondent executed an Affidavit that was filed with a court or in arbitration, and a judgment was entered, that contained any misrepresentations—including but not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the

Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent must instruct the Law Firms to cease post-judgment enforcement activities and Respondent will take the steps necessary, including getting permission from the successor special servicer, to instruct the Law Firms acting on behalf of the Trusts to seek to remove, withdraw, or terminate any active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any such Collections Lawsuits.

51.   Respondents must cooperate in all respects with any directive from the successor special servicer acting on behalf of the Trusts to:

   a.   Make certain disclosures in connection with the collection of Debt owned by the Trusts;

   b.   Withdraw any Affidavit or Collection Lawsuit; or

   c.   Provide loan information or documents to the successor special servicer, including but not limited to, information and documents related to:

      i.   Whether certain loans owned by the Trusts are no longer legally enforceable because the applicable statute of limitations has expired;

      ii.   Whether Collections Lawsuits have been filed on any loans where sufficient documentation, including signed promissory notes and

18

documentation reflecting the complete chain of assignment from the Debt's originator to the Collection Lawsuit's named plaintiff, is not in the possession, custody or control of the Collection Lawsuit's named plaintiff to prove the existence of the Debt owed to the named plaintiff, or where the applicable statute of limitations has expired; and

iii.  Whether judgments were obtained in Collections Lawsuits described in Paragraph 51(c)(ii) and the identity of Consumers from whom the Trusts obtained payments in response to those Collections Lawsuits, and the specific amounts collected from these Consumers.

## VII

## Compliance Plan

**IT IS FURTHER ORDERED** that:

52.  Within ninety (90) days of the Effective Date, Respondent must submit to the Regional Director for review and determination of non-objection a compliance plan designed to ensure that the Attorney Network business unit of Respondent complies with all applicable Federal consumer financial laws with respect to Collections Lawsuits and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

a.  Detailed steps for addressing each action required by this Consent Order;

b.  Comprehensive, written policies and procedures designed to prevent violations of Federal consumer financial laws and associated risks of harm to Consumers with respect to Collections Lawsuits;

c.  An effective employee training program required for all employees with any involvement in Collections Lawsuits, including but not limited to Affiants, whose duties include reviewing, executing, preparing, processing, verifying, , or notarizing of Affidavits that includes regular, specific, comprehensive training in Federal consumer financial laws commensurate with individual job functions and duties;

d.  Implementation of reasonable and appropriate written policies and procedures to ensure the proper notarization processes for Affidavits, including that notaries place the Affiants under oath and witness their signatures;

e.  Implementation of reasonable and appropriate written policies and procedures to ensure that Affiants verify the accuracy of each statement made in an Affidavit before executing the Affidavit;

f.  Comprehensive, written policies and procedures designed to ensure that any Law Firms engaged by Respondent to collect Debt do not violate any Federal consumer financial laws, which must include at a minimum:

   i.  the Law Firm's duty to maintain adequate internal controls to ensure compliance with Federal consumer financial laws;

   ii.  the Law Firm's duty to provide adequate training on compliance with all applicable Federal consumer financial laws and

20

Respondent's policies and procedures related to Collections Lawsuits;

iii. Respondent's authority to conduct periodic onsite reviews of the Law Firm's controls, performance, and information systems related to Collections Lawsuits; and

iv. periodic review by Respondent of the Law Firm's controls, performance, and information systems related to Collections Lawsuits; and

g. Specific timeframes and deadlines for implementation of the steps described above.

53. The Regional Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Compliance Plan, Respondent must make the revisions and resubmit the Compliance Plan to the Regional Director within thirty (30) days.

54. After receiving notification that the Regional Director has made a determination of non-objection to the Compliance Plan or any amendments thereto, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VIII

### Role of the Board

**IT IS FURTHER ORDERED** that:

55. Respondent's Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

56. Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

57. In each instance that this Consent Order requires the Board to ensure adherence to or perform certain obligations of Respondent, the Board must:

    a. Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

    b. Require timely reporting by management to the Board on the status of compliance obligations; and

    c. Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## IX

## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

58. Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, and taking

into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $2.5 million to the Bureau.

59. Within ten (10) days of the Effective Date, Respondent must pay $1.5 million of the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions. The remainder of the civil money penalty shall be paid in one installment within sixty (60) days of the Effective Date.

60. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

61. Respondent must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

62. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any

23

payment that the Bureau makes from the Civil Penalty Fund (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within thirty (30) days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X

## Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

63. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

64. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

65. Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

66.    Within thirty (30) days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to Consumers and describe the Consumers or classes of Consumers to whom that redress has been or will be paid.

## XI

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

67.    Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least thirty (30) days before the development, but in any case no later than fourteen (14) days after the development.

68.    Within ninety (90) days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Regional Director an

accurate written compliance progress report (Compliance Report) that has

been approved by the Board, which, at a minimum:

   a.  Describes in detail the manner and form in which Respondent has

      complied with this Consent Order; and

   b.  Attaches a copy of each Order Acknowledgment obtained under

      Section XII unless previously submitted to the Bureau.

## XII

### Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

69.  Within thirty (30) days of the Effective Date, Respondent must deliver a

copy of this Consent Order to each of its board members as well as to any

managers, employees, Service Providers, or other agents and

representatives who have responsibilities related to the subject matter of the

Consent Order.

70.  For five (5) years from the Effective Date, Respondent must deliver a copy of

this Consent Order to any business entity resulting from any change in

structure referred to in Section XI, any future board members or executive

officers, as well as to any managers, employees, Service Providers, or other

agents and representatives who will have responsibilities related to the

subject matter of the Consent Order before they assume their

responsibilities.

71.  Respondent must secure a signed and dated statement acknowledging

receipt of a copy of this Consent Order, ensuring that any electronic

signatures comply with the requirements of the E-Sign Act, 15 U.S.C.

§§ 7001-7031, within thirty (30) days of delivery, from all persons receiving

a copy of this Consent Order under this Section.

## XIII

## Recordkeeping

**IT IS FURTHER ORDERED** that

72. Respondent must create, or if already created, must retain for at least five

(5) years from the Effective Date, the following business records:

 a. All documents and records necessary to demonstrate full compliance

with each provision of this Consent Order, including all submissions to

the Bureau.

73. Respondent must retain the documents identified in Paragraph 72 for the

duration of the Consent Order.

74. Respondent must make the documents identified in Paragraph 72 available

to the Bureau upon the Bureau's request.

## XIV

## Notices

**IT IS FURTHER ORDERED** that:

75. Unless otherwise directed in writing by the Bureau, Respondent must

provide all submissions, requests, communications, or other documents

relating to this Consent Order in writing, with the subject line, "*In re*

Transworld Systems, Inc., File No. Year-CFPB- 0018," and send them

either:

 a. By overnight courier (not the U.S. Postal Service), as follows:

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017]

or

b.  By first-class mail to the below address and contemporaneously by

email to Enforcement_Compliance@cfpb.gov:

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017

## XV

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

76.  Respondent must cooperate fully with the Bureau in this matter and in any

investigation related to or associated with the conduct described in Section

V. Respondent must provide truthful and complete information, evidence,

and testimony and Respondent must cause its officers, employees,

representatives, or agents to appear for interviews, discovery, hearings,

trials, and any other proceedings that the Bureau may reasonably request

upon ten (10) days written notice, or other reasonable notice, at such places

and times as the Bureau may designate, without the service of compulsory

process.

## XVI

## Compliance Monitoring

28

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this Consent Order:

77. Within fourteen (14) days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

78. Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

79. Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII
## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

80. Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

81. The Regional Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Regional Director must be in writing.

## XVIII

### Administrative Provisions

82. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 83.

83. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

84. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

85. This Consent Order will terminate five (5) years from the Effective Date or five (5) years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not

violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

86.   Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

87.   Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

88.   The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

89.   This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the

accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

90.    Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing the Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this 15th day of September, 2017.

_Richard Cordray_
Richard Cordray
Director
Consumer Financial Protection Bureau

32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

ATTORNEY GENERAL OF THE STATE OF NEW YORK
BUREAU OF CONSUMER FRAUDS & PROTECTION
—————————————————————————

In the Matter of the
Investigation by Letitia James,
Attorney General of New York, of

Assurance No. 20-061

Transworld Systems, Inc.,

Respondent.

—————————————————————————

## ASSURANCE OF DISCONTINUANCE

The Office of the Attorney General of the State of New York ("NYAG") commenced an

investigation under New York Executive Law § 63(12) and New York General Business Law

§ 349 concerning the debt collection practices of respondent Transworld Systems, Inc. ("TSI"

and, together with the NYAG, the "Parties").  This Assurance of Discontinuance ("Assurance")

contains the findings of the NYAG's investigation and the relief agreed to by the Parties.

## I. FINDINGS

### A. TSI's Role in the National Collegiate Student Loan Trust Servicing Structure

1.       TSI is a California corporation with its principal place of business in

Pennsylvania.  TSI provides account receivable management services, including consumer-

facing loan servicing and debt collection, nationwide, including in New York.

2.       Since 2014, TSI, as a special subservicer, has provided services in connection

with collecting defaulted debt owed to the National Collegiate Student Loan Trusts, fifteen

1

Delaware statutory trusts that collectively own hundreds of thousands of private student loans with a face value of approximately $12 billion ("Trusts").[1]

3.      The fifteen Trusts are as follows:  National Collegiate Master Student Loan Trust I, National Collegiate Student Loan Trust 2003-1, National Collegiate Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2, National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-2, National Collegiate Student Loan Trust 2006-3, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-1, National Collegiate Student Loan Trust 2007-2, National Collegiate Student Loan Trust 2007-3, and the National Collegiate Student Loan Trust 2007-4.

4.      The Trusts are passive entities with no employees, and therefore must hire third parties to carry out their business, including servicing performing and non-performing student loans.

5.      TSI's duties as special subservicer are set forth in an agreement with the Trusts' special servicer.  The terms of this agreement and its multiple amendments provide that TSI "shall administer, manage and oversee collection litigation," "shall be responsible for selecting and directly supervising collection attorneys," and "shall review all complaints and affidavits

---

[1] From 2012 to November 1, 2014, an entity known as NCO Financial Systems, Inc. ("NCO") served as the special subservicer to the Trusts.

utilized by" attorneys retained by TSI on behalf of the Trusts, all "with the goal of maximizing the collection of amounts payable on" the loans owned by the Trusts.

6.     When a borrower with a Trust loan has not made a payment for 180 days, the loan is considered in default, and the defaulted loan is transferred to TSI from the pre-default servicer. Generally, if collection efforts have been unsuccessful after two years, TSI retains third-party law firms to attempt to collect the debt on behalf of the Trusts, including by filing lawsuits in the name of the particular Trust.  TSI refers to these law firms as the "Attorney Network."

7.     In New York, TSI retained, on behalf of the Trusts, the Attorney Network law firms Forster & Garbus LLP, a New York limited liability partnership with its principal place of business in New York ("F&G"), and Rubin & Rothman LLC, a New York professional service limited liability company with its principal place of business in New York ("R&R").  TSI retained F&G and R&R pursuant to retainer agreements ("Retainer Agreements").

8.     TSI's form Retainer Agreements provided that each Client, including the Trusts, "authorized [TSI], as its agent, to engage [F&G and R&R] to provide legal services on behalf of such Client in connection with the collection of certain account balances."  The Retainer Agreements give TSI "the absolute right to recall any of [sic] all Accounts placed with [the firms] at any time for any reason, in its sole discretion, with or without cause," grant TSI the right to review written communications to borrowers and "all pleadings prior to filing," and require F&G and R&R to comply with all applicable state and federal laws and TSI's standard operating procedures for debt collection law firms in TSI's Attorney Network.

9.     Once a particular borrower account is placed with the firm, F&G and R&R are required to attempt to contact the borrower – and, if applicable, the co-signer – to try to collect

on the debt before filing a lawsuit.  If traditional methods of debt collection such as phone calls and letters fail, F&G and R&R may turn to litigation.  They have filed thousands of lawsuits against borrowers in New York state courts on behalf of the Trusts ("Trust Lawsuits").[2]  The majority of borrowers sued by the Trusts do not respond to the lawsuits in any way.

10.     When borrowers fail to respond to the complaint filed against them, F&G and R&R generally prepare motions for default judgments, which require the plaintiff Trust to submit proof of service of the summons and complaint, and "proof of the facts constituting the claim, the default and the amount due by affidavit made by the party."  *See* N.Y.C.P.L.R. § 3215.  Upon placement of an account to F&G and R&R, they receive certain documents for each account. Attorney Network law firms can request additional information from TSI, as well as an affidavit with supporting documents attached.

11.     TSI employs a specialized group of employees known as "affiants" who, using templates, execute affidavits for use by Attorney Network law firms in lawsuits brought by the Trusts.  When law firms request affidavits with supporting documents, affiants populate the template, then review the accuracy and completeness of the affidavit against TSI's internal computer system and the computer system of the pre-default servicer.  Following this review, affiants sign the affidavits under penalty of perjury.  TSI then transmits the affidavit and attachments to the law firm that requested it.  TSI's standard operating procedures for its Attorney Network prohibit law firms from altering the format of these affidavits without TSI's consent.

_____

[2] Unless otherwise indicated, this Assurance only concerns conduct that took place in New York and/or related to a New York resident.

12.     On September 18, 2017, TSI resolved, without admitting or denying liability, a regulatory inquiry regarding its debt collection practices on behalf of the Trusts through a Consent Order with the Consumer Financial Protection Bureau.[3]

13.     The NYAG commenced an investigation into TSI's role as the Trusts' special subservicer in 2017.  In the course of its investigation the NYAG reviewed documents produced by TSI, other entities involved in servicing the Trusts, and publicly-available documents from the period 2012 to 2019.

### B.  TSI's Debt Collection Practices on Behalf of the Trusts

14.     Based on this investigation, the NYAG has found, as described below, that from November 2014 through at least April 2016, TSI has, directly or indirectly, repeatedly:

> a) made, or caused to be made, false, misleading, and deceptive statements in formal documents filed in Trust Lawsuits;
>
> b) made, or caused to be made, false, misleading, and deceptive statements in communications with borrowers; and
>
> c) engaged law firms on behalf of the Trusts that filed lawsuits beyond the applicable statute of limitations.

### 1.   Original Creditor

15.     Law firms retained by TSI on behalf of the Trusts repeatedly filed complaints in Trust Lawsuits that incorrectly identified the Trust as the borrower's "original creditor."

---

[3] *See* CFPB, Press Release, *CFPB Takes Action Against National Collegiate Student Loan Trusts, Transworld Systems for Illegal Student Loan Debt Collection Lawsuits*, Sept. 18, 2017, *available at* https://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-national-collegiate-student-loan-trusts-transworld-systems-illegal-student-loan-debt-collection-lawsuits/.

16.     The statement that any Trust is an "original creditor" of any borrower is false because no borrower took out a loan from any of the Trusts.  In fact, the Trusts are assignees of the original creditors (the large financial institutions that originated the loans).

17.     Identifying a Trust as an "original creditor" may confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).[4]

18.     TSI has represented to the NYAG that law firms retained by TSI on behalf of the Trusts – including F&G and R&R – have ceased identifying the Trusts as "original creditors."

    **2.     "Redacted" Documents**

19.     TSI repeatedly submitted sworn affidavits attaching documents TSI identified as "redacted" versions of student loan rosters when, in fact, they were excerpts of student loan rosters that had been cut and pasted into new documents with borrowers' personally identifiable information redacted.[5]

20.     The following is an example of a document identified by TSI as "a redacted copy of the Schedule of transferred loans":

---

[4] In 2017, a New York federal court held that F&G "violated both the [Fair Debt Collection Practices Act] and [New York General Business Law] Section 349 as a matter of law" when it filed complaints identifying Trusts as original creditors, and that "this false statement as to the Trust's status as the 'original creditor' is material as a matter of law."  *Winslow v. Forster & Garbus, LLP*, Case No. 15-Civ.-2996 (AYS), 2017 WL 6375744, at *10, 13, 19 (E.D.N.Y. Dec. 13, 2017).

[5] The Trust loans were originated by third parties and then subsequently assigned, directly or indirectly, to one of the Trusts.  Each assignment agreement included a document identifying the specific student loans being assigned under that agreement.  This list of loans is variously known as a student loan roster, schedule, or exhibit.

| National Collegiate Student Loan Trust 2006-4 | | | | |
| Roster: CHASE BANK | | | | |
| Lender | Lender Code | Marketer | Loan Product | BSSN |
| CHASE BANK | 804976QT | Chase Bank | DTC - Ed One – Undergraduate | XXXXX0648 |

| GUARREF | Disb. Date | Tier | Repay Type | Margin |
|---|---|---|---|---|
| 04336894 | 14-Nov-06 | 6 | DP | 0.0725 |

| Fee to Borrower | TERI Admin Fee | Marketing Fee | Total Gross Disbursed | Total Net Disbursed |
|---|---|---|---|---|
| 0.105 | 0.0175 | 0.0725 | $26,068.16 | $23,331.00 |

| Total Net Principal | Total Capitalized Interest | Total Outstanding Gross Principal | Total Outstanding Unpaid Interest | Fee Reimbursement on 0% Fee Loans |
|---|---|---|---|---|
| $23,331.00 | $0.00 | $26,068.16 | $206.48 | $0.00 |

| | | | Final Reconciliation Settlement Figures | |
| Origination Fee Reimbursement Due Bank | Total Marketing Fees | Marketing Fees Due FMC | Marketing Fees Due Bank | Total Amount Due Bank |
| $225.00 | $1,691.50 | $0.00 | $1,691.50 | $28,191.14 |

21.     In fact, this is a document TSI *created* for the specific litigation by copying identical text and data from a large spreadsheet with multiple accounts and pasting it into a new account-specific document, and removing part of the borrower's Social Security number for privacy purposes.

22.     The schedule listing the individual student loans transferred to the Trust in question is essential to establishing that the Trust is the owner of the loan.  TSI's description of a

7

newly-created document as a "redacted" version of the original document may confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).

23.     TSI has represented to the NYAG that TSI has ceased identifying excerpts of loan rosters cut and pasted into new documents as "redacted" versions of original loan rosters.

### 3.     Personal Knowledge

24.     TSI affiants repeatedly submitted affidavits in support of default judgment motions filed in Trust Lawsuits in which TSI affiants asserted that they had personal knowledge of certain business records when, in fact, they lacked such knowledge.

25.     One New York judge, in dismissing a Trust Lawsuit, found that the affiant was "not involved" in preparing the underlying documents and that the TSI affidavit submitted in that case was, thus, "virtually all hearsay" and did not satisfy the business record exception.[6]

26.     TSI statements purporting to have personal knowledge of key documents the affiants lack may confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).[7]

---

[6] *See* Doc. No. 35, *Nat'l Collegiate Student Loan Trust 2007-3 v. Ellison*, Index No. 2016EF1013 (Sup. Ct. Onondaga County).

[7] A New York federal court, in permitting a case to proceed, held that statements made in Trust lawsuit affidavits concerning the affiants' personal knowledge were "materially misleading" under the Fair Debt Collection Practices Act and New York General Business Law § 349.  *Michelo v. Nat'l Collegiate Student Loan Tr. 2007-2*, Case No. 18-Civ.-1781 (PGG), 2019 WL 5103885, at *23 (S.D.N.Y. Oct. 11, 2019).

27.     TSI has produced documents to the NYAG demonstrating that it has substantially revised its affiant training policies.  TSI now requires affiants working on the Trust portfolio to receive comprehensive, substantive training and be tested on their knowledge periodically.

28.     Among other things, TSI requires affiants to complete training modules on the computer systems used by TSI and the Trusts' pre-default servicer, and how those systems are "used in relation to the NCSLT student loan portfolio, including information on the utilization of both systems and training on data integrity, maintenance of the systems, the data contained within the systems, and the process of record entry/creation."  This same training includes the computer system TSI uses to communicate with Attorney Network law firms.  Following completion of the modules, affiants are required to take a test and answer every question correctly.

29.     Affiants also must take a module called "NCSLT History," which teaches affiants about "the structure of NCSLT and general lifecycle of such loans, starting with the origination of the loans by national banks; the securitization process; servicing and default; and collections."

30.     After affiants receive the foregoing and other substantive training, they are paired with experienced TSI employees for a three-week "nesting" period.  Following this nesting period, affiants are given a test with 50 questions and must receive a score of 90% to pass.  Affiants who pass the test are certified to work on the Trust portfolio, and must be re-certified six months later and semi-annually thereafter.

**4.     Proof of Ownership**

31.     TSI affiants repeatedly signed affidavits in support of default judgment motions filed in Trust Lawsuits that unequivocally stated that a particular student loan was transferred to

a particular Trust when, in fact, the documents submitted to support this assertion failed to conclusively demonstrate a link between the loan at issue and the plaintiff Trust.

32.     As discussed above, in some instances TSI attached an excerpt of a loan roster to the affidavits law firms retained on behalf of the Trusts filed in support of default judgment motions.  Barring any evidentiary objections, this excerpt provides a definitive link between the loan and the Trust.

33.     But, previously, affidavits did not always include an excerpt of a loan roster, and generally linked a particular borrower's loan to the plaintiff Trust by referring to the name of the loan program.  In some instances, however, the loan programs referenced in the documents were not an exact match, and a third-party reviewing the documents – such as a court – would have no non-speculative way to confirm the loan at issue is actually owned by the plaintiff Trust. Although affiants ensure a particular loan was transferred to a particular Trust by other means – for example, comparing borrower account numbers or Social Security numbers – these additional checks were not disclosed in the affidavits.

34.     Affiants' statements concerning ownership may also confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).

35.     TSI has represented to the NYAG that it attaches an excerpt of the loan roster to all affidavits submitted in Trust Lawsuits.

5.    **Servicing Agent**

36.    Law firms retained by TSI on behalf of the Trusts repeatedly filed complaints in Trust Lawsuits which referenced a loan's "servicing agent," thereby causing potential confusion about the entities involved in originating borrower loans.

37.    These statements concerning a "servicing agent" may confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).

38.    TSI has represented to the NYAG that law firms retained by TSI on behalf of the Trusts – including F&G and R&R – are no longer including references to an unidentified "servicing agent" in Trust Lawsuits.

6.    **Lawsuits Filed Outside the Statute of Limitations**

39.    Law firms retained by TSI on behalf of the Trusts repeatedly filed lawsuits in New York outside of the applicable three-year statute of limitations.

40.    The NYAG maintains that the Trusts are subject to New York's borrowing statute, and, by operation of the borrowing statute, Trust Lawsuits must be filed within three years of the date of breach.  While TSI does not agree that operation of the borrowing statute requires Trust Lawsuits be brought within three years, TSI has represented to the NYAG that, out of an abundance of caution, law firms bringing Trust Lawsuits have been applying a three-year statute of limitations.

**7.      Communications Implying Actions TSI Cannot Legally Take**

41.     Collection agencies retained by TSI on behalf of the Trusts have repeatedly threatened legal action against borrowers even though the Trusts could not or would not sue because the statute of limitations for suing on the debt had expired.

42.     In attempting to collect time-barred debt, collection agencies retained by TSI on behalf of the Trusts sent certain borrowers a notice bearing a heading of "Settlement Offer" stating that the subject Trust was "willing to settle your account for [percentage] of your total balance due to settle your past balance."

43.     These communications may confuse consumers with debt as to which the statute of limitations has expired about the nature and legal status of the debt, impede consumers' ability to respond, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept).

44.     TSI amended its standard operating procedures – with which all agencies retained by TSI on behalf of the Trusts must comply – to "require[] that Agencies  refrain from using certain words which have been deemed to imply litigation ('settle' or 'settlement') in any verbal or written communication related to TSI's client's debts that Agencies are attempting to collect outside of the statute of limitations." TSI recommends "instead using words which do not imply litigation which may include 'resolve,' 'resolution,' 'satisfaction,' and 'satisfied.'"

**C.  The NYAG's Conclusions**

45.     The NYAG finds that TSI's acts and practices as described in paragraphs 1 to 44 above ("Findings") constitute repeated violations of New York Executive Law § 63(12) ("Executive Law § 63(12)"), New York General Business Law § 349 ("GBL § 349"), the Fair

Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq.* ("FDCPA"), and the Consumer

Financial Protection Act of 2010, 12 U.S.C. §§ 5531 *et seq.* ("CFPA").

46.     TSI neither admits nor denies the NYAG's Findings.

The NYAG finds the relief and agreements contained in this Assurance appropriate and

in the public interest.

THEREFORE, the NYAG is willing to accept this Assurance pursuant to Executive Law

§ 63(15), in lieu of commencing a statutory proceeding for violations of New York Executive

Law § 63(12), GBL § 349, the FDCPA, and the CFPA, based on the conduct described above.

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the Parties:

## II.   RELIEF

### A.   Injunctive Relief

47.     This Assurance shall apply to TSI, its employees, agents, servants,

representatives, parents, subsidiaries, affiliates, predecessors, shareholders, officers, directors,

heirs, executors, administrators, principals, successors, and assigns, and all other persons or

entities acting on TSI's behalf or under its control, including law firms retained by TSI on behalf

of the Trusts to file Trust Lawsuits.  This Assurance concerns conduct in New York and/or

related to a New York resident.

48.     This Assurance shall be effective as of September 11, 2020 ("Effective Date").

49.     TSI, in collecting or attempting to collect debts on behalf of the Trusts, shall not

engage or attempt to engage in conduct in violation of any applicable law, including, but not

limited to, Executive Law § 63(12), GBL § 349, the FDCPA, and the CFPA.

13

50.     TSI shall not directly or indirectly make, or cause to be made, false, misleading, or deceptive statements in any document filed in a Trust Lawsuit, including, but not limited to, the following:

a) identifying excerpts of documents as "redacted" versions of original documents unless they are versions of original documents altered only by the obscuring of wholly irrelevant or sensitive information on pages, spreadsheet lines, or database records;

b) representing that an affiant has personal knowledge of education loan records unless the affiant (i) has personally reviewed the education loan records; and (ii) has completed the following training concerning:  (A) the names and types of systems in which the education loan records have been stored since their initial creation, and the entity which owned and controlled each system, or, alternatively, the representations of the prior servicer that it maintained the educational loan records in the course of its regularly conducted business activity; (B) the name, type, and methods of operation of the system in which the education loan records are now held; and (C) the means by which the education loan records were transferred into the system currently holding them, whether operated by TSI or another, and the methods used to check the integrity of the import or to verify the data imported by other means; and

c) representing that an affiant has personal knowledge of the chain-of-title of a particular loan unless the affiant has personally reviewed the records establishing the Trust's ownership of the loan, including the underlying loan agreements and each sales, pooling, or assignment agreement governing every sale or other transfer of the loan in question, including (if the loan is not specifically and individually identified in the body of the agreement) the schedule, excerpt from the loan roster, or exhibit establishing that the agreement refers specifically and individually to the loan being sued upon.

51.     TSI shall take all reasonable steps available to TSI, including regular monitoring of its Attorney Network, to ensure that Attorney Network law firms retained by TSI on behalf of the Trusts shall not:

14

    a) file lawsuits outside the three-year statute of limitations applicable to Trust Lawsuits brought in New York;

    b) identify one of the Trusts as a borrower's "original creditor" (or substantially similar language); and

    c) represent that a borrower applied for a loan from a "servicing agent" or other entity if such entity did not receive or process such applications.

52.    TSI shall take all reasonable steps available to TSI, including regular monitoring of collections agencies, to ensure that collections agencies retained by TSI shall not use the word "settlement" in communications with consumers regarding time-barred debt.

53.    Within ninety (90) days of the Effective Date, law firms engaged by TSI on behalf of the Trusts shall voluntarily dismiss with prejudice all time-barred lawsuits filed after January 1, 2018 ("Untimely Trust Lawsuits") and pending as of the Effective Date.

54.    Within ninety (90) days of the Effective Date, TSI shall release, vacate, or withdraw, or cause to be released, vacated, or withdrawn, all pending garnishments, levies, liens, restraining notices, attachments, or any other judgment enforcement mechanism, obtained as a result of judgments obtained in Untimely Trust Lawsuits and pending as of the Effective Date.

55.    With respect to Untimely Trust Lawsuits no longer pending as of the Effective Date, TSI shall take steps toward obtaining the vacatur of any judgment, including requesting consent of the relevant parties to vacate and, upon receiving such consent, directing the law firm to so vacate by joint stipulation, pursuant to N.Y.C.P.L.R. 5015(b), provided the following conditions are met::

    a) the borrower requests vacatur of the judgment, either by filing a motion with a court or by request directed to TSI, F&G, R&R, or one of the Trusts;

b) the lawsuit was filed on or after January 1, 2018;

c) the lawsuit was filed more than three years from the date of breach; and

d) a default judgment was entered.

56.     With respect to all default judgments vacated by stipulation pursuant to the foregoing paragraph, TSI shall request consent from the relevant parties to return the amounts collected after the default judgment was entered and, upon receiving such consent, and monies from the Trust, return the monies collected pursuant to any such default judgment to a borrower.

57.     Within fifteen (15) days of the Effective Date, TSI shall provide a copy of this Assurance to all individuals at TSI who have supervisory responsibilities regarding the Trust portfolio.

58.     TSI shall maintain a training program for all TSI affiants involved with servicing the Trust portfolio that is substantially similar to the training program described in the Assurance and the materials TSI provided to the NYAG.

59.     Within thirty (30) days of the Effective Date, TSI shall deliver a copy of this Assurance to all law firms retained on behalf of the Trusts to collect debts in New York.  TSI shall secure a signed and dated statement from each law firm acknowledging receipt of the Assurance.

60.     TSI shall take all reasonable steps to ensure that all law firms retained on behalf of the Trusts to collect debts in New York comply with the Assurance.

### B. Monetary Relief

61.     In consideration of the making and execution of this Assurance, TSI shall pay to the State of New York the sum of $600,000.00, such money to be disbursed by the NYAG as the

NYAG deems appropriate.  TSI shall pay the $600,000 in two installments:  $300,000 shall be payable within thirty (30) days of the Effective Date, and the remaining $300,000 shall be payable within ninety (90) days of the Effective Date.  TSI shall make each installment payment by wire transfer using account information to be provided by the NYAG prior to the Effective Date.

62.     Within ninety (90) days of the Effective Date, TSI shall submit to the NYAG an electronic database identifying all Untimely Trust Lawsuits.  For each Untimely Trust Lawsuit, the database shall identify the plaintiff's name; the court where the lawsuit was filed; the defendant's name; the defendant's last known address, telephone number, and email address; the date on which the defendant allegedly breached the student loan agreement; the date on which the lawsuit was filed; and all amounts collected post-judgment.

63.     Any funds not disbursed pursuant to paragraph 61 shall be retained by the NYAG as penalties and costs.

## III.   COMPLIANCE AND TRAINING

64.     Within ninety (90) days of the Effective Date and continuing for a period of two (2) years thereafter, TSI shall submit to the NYAG, no later than thirty (30) days after the conclusion of each three-month period, quarterly reports describing with specificity TSI's compliance with the provisions of this Assurance during the prior quarter, including, but not limited to, TSI's efforts to ensure all law firms and collection agencies retained on behalf of the Trusts to collect debts in New York have complied with this Assurance.

65.     If TSI determines that it or any law firm or collection agency it retained on behalf of the Trusts in New York has engaged in any conduct prohibited by this Assurance, it shall promptly take all actions necessary to cease such conduct.

66.     Within ten (10) days of making the determination described in the foregoing paragraph, TSI shall submit to the NYAG a report detailing the conduct, the specific TSI employees, law firms, or collection agencies who engaged in the conduct, and TSI's plan to ensure that the practices cease and to remediate any resulting harm.

67.     TSI shall notify the NYAG of any development that may affect TSI's compliance obligations under this Assurance, including, but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Assurance; the filing of any bankruptcy or insolvency proceeding by or against TSI; or a change in TSI's name or address.  TSI shall make all reasonable efforts to provide such notice at least thirty days (30) before the development, but in no event shall TSI provide such notice later than fourteen days after the development.

## IV.   <u>MISCELLANEOUS</u>

68.     TSI expressly agrees and acknowledges that the NYAG may initiate a subsequent investigation, civil action, or proceeding to enforce this Assurance, for violations of the Assurance, or if the Assurance is voided for any reason, and agrees and acknowledges that in such event:

        a)   any statute of limitations or other time-related defenses are tolled from and after the effective date of this Assurance;

b) the NYAG may use statements, documents or other materials produced or provided by TSI prior to or after the effective date of this Assurance;

c) any civil action or proceeding must be adjudicated by the courts of the State of New York, and that TSI irrevocably and unconditionally waives any objection based upon personal jurisdiction, inconvenient forum, or venue; and

d) evidence of a violation of this Assurance shall constitute prima facie proof of a violation of the applicable law pursuant to Executive Law § 63(15).

69.     If a court of competent jurisdiction determines that TSI has violated the Assurance, TSI shall pay to the NYAG the reasonable cost, if any, of obtaining such determination and of enforcing this Assurance, including, but not limited to, legal fees, expenses, and court costs.

70.     All terms and conditions of this Assurance shall continue in full force and effect on any successor, assignee, or transferee of TSI.

71.     Nothing contained herein shall be construed as to deprive any person of any private right under the law.

72.     This Assurance may not be used by any third party in any other proceeding.  This Assurance is not intended to be, and should not be construed as, an admission of liability by TSI.

73.     This Assurance resolves and releases all claims by the NYAG against TSI for the alleged conduct described in the Findings from the commencement of the NYAG's investigation to the Effective Date; provided, however, that nothing in this Assurance shall be deemed to preclude the NYAG's review of conduct that occurs after the Effective Date, or any claims that may be brought by the NYAG to enforce TSI's compliance with this Assurance.

74.     Any failure by the NYAG to insist upon the strict performance by TSI of any of the provisions of this Assurance shall not be deemed a waiver of any of the provisions hereof, and the NYAG, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Assurance to be performed by TSI.

75.     All notices, reports, requests, and other communications pursuant to this Assurance must reference Assurance No. 20-061, and shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery; express courier; or electronic mail at an address designated in writing by the recipient, followed by postage prepaid mail, and shall be addressed as follows:

> If to the NYAG:
>
> New York State Office of the Attorney General
> Bureau of Consumer Frauds and Protection
> Attn:  Christopher L. McCall, Assistant Attorney General
> 28 Liberty Street, 20th Floor
> New York, New York  10005
> Telephone:  (212) 416-8303
> Facsimile:  (212) 416-6003
>
> If to TSI:
>
> Allyson B. Baker, Esq.
> Venable LLP
> 600 Massachusetts Avenue, N.W.
> Washington, D.C.  20001
> Telephone:  (202) 344-4708
> Facsimile:  (202) 344-8300

76.     The NYAG has agreed to the terms of this Assurance based on the NYAG's own investigation as set forth in the Findings, and representations that TSI has made to the NYAG. To the extent that any material representations by TSI or its counsel are later found to be inaccurate or misleading, this Assurance is voidable by the NYAG in its sole discretion.

77.     No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by TSI in agreeing to this Assurance.

78.     TSI represents and warrants, through the signatures below, that the terms and conditions of this Assurance are duly approved.

79.     Nothing in this Agreement shall relieve TSI of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

80.     Nothing contained herein shall be construed to limit the remedies available to the NYAG in the event that TSI violates the Assurance after its effective date.

81.     This Assurance may not be amended except by an instrument in writing signed on behalf of the Parties to this Assurance.

82.     In the event that any one or more of the provisions contained in this Assurance shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, in the sole discretion of the NYAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

83.     TSI acknowledges that it has entered this Assurance freely and voluntarily and upon due deliberation with the advice of counsel.

84.     This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

85.     This Assurance may be executed in multiple counterparts by the Parties hereto. All counterparts so executed shall constitute one agreement binding upon all Parties,

notwithstanding that all Parties are not signatories to the original or the same counterpart.  Each

counterpart shall be deemed an original to this Assurance, all of which shall constitute one

agreement to be valid as of the effective date of this Assurance.  For purposes of this Assurance,

copies of signatures shall be treated the same as originals.  Documents executed, scanned and

transmitted electronically and electronic signatures shall be deemed original signatures for

purposes of this Assurance and all matters related thereto, with such scanned and electronic

signatures having the same legal effect as original signatures.

Dated:  September 11, 2020

TRANSWORLD SYSTEMS, INC.

By: _____

Joseph E. Laughlin
Chief Executive Officer

LETITIA JAMES
Attorney General of the State of New York

By: _____

Jane M. Azia
Bureau Chief

By: _____

Christopher L. McCall
Assistant Attorney General

Consumer Frauds and Protection Bureau
28 Liberty Street
New York, New York  10005

*Counsel for the Attorney General*
*of the State of New York*

notwithstanding that all Parties are not signatories to the original or the same counterpart.  Each counterpart shall be deemed an original to this Assurance, all of which shall constitute one agreement to be valid as of the effective date of this Assurance.  For purposes of this Assurance, copies of signatures shall be treated the same as originals.  Documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Assurance and all matters related thereto, with such scanned and electronic signatures having the same legal effect as original signatures.

Dated:  August ____, 2020

TRANSWORLD SYSTEMS, INC.                    LETITIA JAMES
                                            Attorney General of the State of New York


By: _____            By: _____

Joseph E. Laughlin                          Jane M. Azia
Chief Executive Officer                     Bureau Chief
                                            Consumer Frauds and Protection Bureau
                                            28 Liberty Street
                                            New York, New York  10005

                                            By: _____

                                            Christopher L. McCall
                                            Assistant Attorney General
                                            Consumer Frauds and Protection Bureau
                                            28 Liberty Street
                                            New York, New York  10005

                                            *Counsel for the Attorney General*
                                            *of the State of New York*

<u>DECLARATION OF MONICA HARTSOCK</u>

I, Monica Hartsock, declare as follows:

1.     I am an attorney at the Law Office of Monica Hartsock, the firm of record for Defendant in this action and make this declaration to the best of my knowledge, information and belief of the facts stated herein.

2.     At the time that Defendant answered the complaint in this action, she was unaware of the fact Plaintiffs had violated fair debt collection laws in filing this case. Once I was retained to represent Defendant, I notified her that she had an independent action. I am informed and believe, and on that basis state that Defendant first learned of the fact Plaintiffs' actions constituted an independent cause of action against Plaintiffs and Cross-Defendants by Defendant when I became counsel in August, 2020.

3.     Upon becoming counsel of record, I began the meet and confer process with Plaintiffs' counsel in order to seek a stipulation to consolidate the two cases, allow Defendant to amend her answer to the Complaints, and seek leave for Defendant to file a cross-complaint.

4.     As a result of the Parties' meet and confer efforts, we were able to agree to stipulate to the consolidation of the two cases and that Defendant be allowed to file an amended answer. We were unable to reach an agreement that Defendant be allowed to file a Cross-Complaint.

5.     Once it was clear that meet and confer efforts to stipulate to the filing of Defendant's proposed Cross-Complaint were extinguished, I secured the Court's next available hearing date for this motion.

6.     It is in the interest of justice to permit the filing of the cross-complaint because the claims are related to the same subject loans between the same parties.

///
///
///
///

1

**DECLARATION OF MONICA HARTSOCK**

7.   The trial in this action has not yet been set and discovery has not yet begun.

8.   Attached as Exhibit A is Defendant's proposed cross-complaint.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed by me in Chino, California on November 10, 2020.

By: _____

Monica Hartsock, Esq.

2

**DEFENDANT'S MOTION FOR LEAVE TO FILE A CROSS-COMPLAINT**

**PROOF OF SERVICE**

**National Collegiate Student Loan Trusts 2007-1 & 2007-2 v. Aleksia Hepner**

STATE OF CALIFORNIA    )
                                          )
COUNTY OF SAN BERNARDINO        )

I am over the age of 18 years and not a party to the within action; my address is 4562 Hastings Ct., Chino, California 91710. My electronic service address is Monica@Hartsocklawfirm.com

On this date, I served the foregoing documents described as:

**DEFENDANT ALEKSIA LINDSAY fka ALEKSIA HEPNER'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A CROSS-COMPLAINT; MEMORANDM IN SUPPORT; DECLARATION OF MONICA HARTSOCK; DEFENANT'S PROPOSED CROSS-COMPLAINT**

 X  a true copy addressed as follows:

LAW OFFICES OF PATENAUDE & FELIX, A.P.C.
Stephanie J. Boone, Esq.
Stephanie.Boone@pandf.us

CC: bshaw@sessions.legal

 X  (BY ELECTRONIC SERVICE) I electronically filed the document listed above to the address set forth above on today's day and in doing so, the legal processing company also electronically served the documents per the written agreement of the parties.

____(BY OVERNIGHTMAIL)  I deposited such envelope with postage thereon fully prepaid in the United States mail at Chino, California to the above listed address in a manner in which I know to be delivered the following day.

____(By Personal Service) I caused such envelope to be hand-delivered to the addressee, or to their office(s).

 X  (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 10, 2020 at Chino, California.

MONICA L. HARTSOCK

3